NOT DESIGNATED FOR PUBLICATION

No. 111,792

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

LUKE LINXWILER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Pottawatomie District Court; JEFFREY R. ELDER, judge. Opinion filed March 4, 2016. Affirmed.

*Michelle A. Davis*, of Kansas Appellate Defender Office, for appellant.

*Sherri Schuck*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before STANDRIDGE, P.J., LEBEN and POWELL, JJ.

*Per Curiam*:  A jury convicted Luke Linxwiler of aggravated burglary, aggravated intimidation of a victim/witness, residential burglary, two counts of felony theft, felony criminal damage to property, and misdemeanor criminal damage to property. Linxwiler appeals his convictions and sentences on three grounds:  (1) The district court erred when it inadequately investigated his request for a new trial attorney; (2) the district court committed clear error in failing to give an accomplice instruction; and (3) the district court improperly used his criminal history to increase his sentence without proving such criminal history to a jury beyond a reasonable doubt. Finding no error by the district court, we affirm Linxwiler's convictions and sentences.

1

FACTUAL AND PROCEDURAL BACKGROUND

On June 3, 2013, Roxanne Holecek reported to police that she and her husband returned home from vacation and discovered their house had been forcibly entered with numerous items missing. Four days later, Harold Massey reported that his residence had been forcefully entered and damage had been caused throughout the house by bullet holes. Massey also reported several items missing from his residence, including firearms and a metal detector. Both homes were located in St. Marys, Kansas.

During the investigation of the burglaries, Holecek advised that just prior to leaving town she told her manicurist, Stephanie Cole, that she and her husband were going on vacation. Cole's name also surfaced when Massey indicated that his daughter, Amy Griffin—who lived with him—was friends with Cole and that Cole had a reputation for past involvement in illegal activities.

Police also learned that some of Massey's property had been taken prior to the date he reported finding bullet holes in his home. Griffin testified that when she returned home from town the afternoon of May 23, 2013, her boyfriend was standing in the driveway talking to a male later identified as Linxwiler. Massey was not home. Linxwiler approached Griffin in her vehicle and told her he was there to retrieve belongings that Cole believed Griffin had stolen from her. After parking her vehicle, Griffin encountered Cole and invited Cole inside to talk. Linxwiler and an unidentified male entered Massey's house over Griffin's objections. Linxwiler threatened to harm Griffin's father and her children if she did not eventually return Cole's property in addition to $2,000. Cole and Linxwiler told Griffin that they would not leave until they received property in compensation for the belongings stolen from Cole. Griffin allowed them to take Massey's metal detector and a firearm in an attempt to convince Cole, Linxwiler, and the unidentified male to leave. Griffin did not contact law enforcement and only recounted

2

the incident after Massey reported damage to his house by bullets and the property missing. Griffin's boyfriend corroborated her testimony.

On June 25, 2013, police obtained and executed a search warrant at Cole's residence. Linxwiler, Cole, and Cole's children were present at the residence when police arrived. Detective Eric Green testified that law enforcement found items belonging to the Holeceks and to Massey throughout Cole's residence and in a car registered to Linxwiler parked out front. Linxwiler and Cole were arrested.

At the police department, Linxwiler and Cole each confessed to their roles in the respective burglaries. Specifically, Linxwiler confessed that he had forced entry into the Holecek residence and taken items. Linxwiler also admitted that he had taken items from Massey's house twice, shooting various things in Massey's house with a handgun the second time while he was intoxicated. However, he stated that Cole had done nothing wrong and he wanted her released.

The State charged Linxwiler with two counts of aggravated robbery, one count of aggravated burglary, and one count of felony theft in connection with the events that occurred at Massey's house on May 23, 2013. The State also charged Linxwiler with residential burglary, felony theft, and felony criminal damage to property in connection with the events occurring between May 31, 2013, and June 3, 2013, when Linxwiler allegedly returned to Massey's house a second time. Finally, the State charged him with residential burglary, felony theft, and felony criminal damage to property stemming from the events occurring at the Holecek residence. The State charged Cole similarly.

Following a consolidated preliminary hearing, the district court opted not to bind over either Linxwiler or Cole on the charges of aggravated robbery but took under advisement a count of aggravated intimidation of a victim. The district court consolidated

3

both cases following a motion from the State. Prior to trial Cole entered into a plea agreement in exchange for her testimony against Linxwiler.

On January 16, 2014, Linxwiler filed a pro se motion for a bond hearing in which he requested an OR bond to take advantage of a job opportunity in order to retain private counsel. The district court heard his motion that same day. At the outset of the hearing, Linxwiler's counsel, Russ Roe, advised the district court that Linxwiler wished to fire him. The following exchange took place:

> "THE COURT: Well, what's the basis for wanting other counsel? . . .
> . . . .
> "[LINXWILER]: . . . There's . . . a few things with Detective Green, the transcripts. I feel the transcripts—I don't understand why I didn't get any transcripts or have any right to transcripts and why Detective Green's testimony wasn't involved in the transcripts. When I was here for the pretrial, I blatantly heard several lies, and now they're not admissible.
> ". . . I don't feel he's agreeing with me. We're having a conflict of interest here. I feel like if I was out there, had a job, bought my own lawyer, you know, maybe if he was paid, he might care a little bit more about what I'm caring about, when I see needs to be addressed.
> "I got painted many obvious technicalities. I've been shut down.
> "I understand your not getting paid, you know.
> "With all due respect, I've heard he's a great lawyer and one of the best is what I usually hear. But I just—there's some—some—I just feel like there's some kind of corruption or something going on. He won't listen to me.
> "And earlier, in the beginning, I wanted explained the legalese language that is spoken in court for me to understand. It's a—there's a language among the law society that you guys have. He's—he wasn't really educating me on that. Every time I'd ask, he'd shut me down, so I could understand more about what was going on in my case.
> "I've asked for a full discovery several times. It's taken more, you know, alls I've gotten was a partial.

"[ROE]: I've provided full discovery several weeks ago—several months ago, actually, and I think it got lost someplace. I'll copy the file again tomorrow and drop it off here tomorrow afternoon.

"[LINXWILER]: That's—but that's not a full discovery. It's . . .

"[ROE]: Yeah.

"[LINXWILER]: It didn't have all the witness statements pertained in it.

"THE COURT: Well, Mr. Linxwiler, I don't think that—I mean, your speculating on few things which even if they were true, I don't think are sufficient to warrant a removal of Mr. Roe from your counsel and then a delaying the trial because the new counsel. I know portions of the transcript were ordered to be prepared. I don't know whether they have been.

"[PROSECUTOR]: They have been, Judge."

"[ROE]: Yeah, they have.

. . . .

"[LINXWILER]: I just don't.

"THE COURT: [Y]our request for another attorney is denied."

Five days later, on the morning of trial, Linxwiler submitted another pro se motion asking the court to dismiss Roe, contending that he had conflicts of interest with Roe because Roe had only talked to him for 15 minutes regarding his case and did not get discovery to him in a timely manner. The district judge took up the merits of Linxwiler's motion in chambers with Linxwiler present:

"THE COURT: All right. We are ready to start jury trial today. I received a handwritten motion from Mr. Linxwiler, apparently drafted by him pro se over the weekend, again asking for another attorney.

"Mr. Linxwiler, I have read your motion. I don't think there is a basis to allow you to select another court-appointed attorney. You have an attorney, he's highly qualified, and your motion is going to be denied.

"We are ready to proceed.

"[LINXWILER]: Don't I have anything to say in this, nothing?

"THE COURT: Well, you did have something to say. It was in your motion and I've read your motion. It is of record. You have the right to—obviously you can appeal my decision not to allow you to get another attorney—

"[LINXWILER]: Yeah, I'd like to do that, then, because my family's currently looking for, to retain a private lawyer for myself.

"THE COURT: Mr. Linxwiler, your family should have been doing this way before today. We are set for trial today.

"[LINXWILER]: I asked this last week.

"THE COURT: Your motion is denied. We are going to proceed to trial."

The district court proceeded to additional matters and Linxwiler, still in chambers, requested to be heard again:

"[LINXWILER]: Can I speak here, please? I'm not trying to be, you know, pain in the ass or anything but me, me and him have only discussed our, my case together, and I've had him for six months, for 30, 30 minutes, if that.

"[ROE]: Oh, it's been a lot longer than that.

"[LINXWILER]: No, it hasn't. You can ask my mother. I've made several phone calls to him in the beginning, what was it, early July I retained him, or not retained but appointed. It took him two and a half months to not only get me discovery but even to return my call. He called me the day before my, what was it, pretrial or preliminary hearing, called me the day before, talked to me for five minutes, I asked him how he feels about it, you know. There wasn't really much.

"We haven't discussed my case at all. I haven't had a chance to explain to him witnesses on my behalf that I could bring, we haven't talked about nothing, nothing. It's all, the decision's made in the courtroom, the prelim, the transcripts that I wanted that I have a right, that I should have a right to, the two people that he decided on wasn't discussed with me. He didn't discuss that with me, he made a decision on his own, okay.

"THE COURT: All right, sir, Mr. Linxwiler, that's enough. You can bring up those matters if you are convicted."

After a 3-day jury trial that included Cole's testimony and Linxwiler's confession, Linxwiler was convicted of aggravated burglary, aggravated intimidation of a victim,

6

residential burglary, two counts of felony theft, felony criminal damage to property, and misdemeanor criminal damage to property. The jury acquitted him on one count each of residential burglary, criminal threat, and felony theft.

At sentencing, Linxwiler scored an A criminal history based upon three previous person felony convictions occurring after 1993. The district court ordered a downward durational departure sentence of 90 months' incarceration and 24 months' postrelease supervision for the primary offense, with concurrent and consecutive sentences on the remaining counts, for a total of 108 months in prison.

Linxwiler timely appeals.

### DID THE DISTRICT COURT ABUSE ITS DISCRETION WHEN IT DENIED LINXWILER'S REQUEST FOR A NEW TRIAL ATTORNEY?

Linxwiler first argues that the district court did not adequately investigate whether a conflict warranting replacement counsel existed between himself and his trial attorney. The State counters that the district court adequately investigated Linxwiler's complaints, but even if it did not, the deficiencies cited by Linxwiler did not warrant replacement counsel.

The district court's refusal to appoint new trial counsel is reviewed using an abuse of discretion standard. See *State v. Brown*, 300 Kan. 565, Syl. ¶ 6, 331 P.3d 797 (2014). A judicial action constitutes an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

It is well established that

"[a] criminal defendant has a constitutional right to the effective assistance of counsel, but that right does not give a criminal defendant for whom counsel has been appointed the right to choose which attorney will represent him or her. [Citation omitted.] 'If a defendant seeks substitute counsel, the defendant must show justifiable dissatisfaction with his or her appointed counsel, which can be demonstrated by showing a conflict of interest, an irreconcilable disagreement, or a complete breakdown in communication between counsel and the defendant.' 300 Kan. [565], Syl. ¶ 3.

"A criminal defendant seeking new counsel must provide an articulated statement of attorney dissatisfaction. Such a statement by the defendant triggers the district court's duty to inquire into the potential conflict of interest. [Citation omitted]. 'A district court's duty to inquire into a potential attorney/client conflict emanates from its responsibility to assure that a defendant's constitutional right to effective assistance of counsel is honored.' 300 Kan. [565], Syl. ¶ 5." *State v. Gooch*, No. 110,418, 2014 WL 5849227, at *6-7 (Kan. App. 2014) (unpublished opinion), *rev. denied* 302 Kan. ___ (June 29, 2015).

Between the pretrial hearing and the chambers meeting on the morning of the trial, Linxwiler expressed dissatisfaction with his attorney, stating that he felt Roe had not spent sufficient time meeting with him, had not timely provided him with the complete discovery documents, and had not adequately explained the nature and procedure of the charges against him.

The Kansas Supreme Court's decision in *State v. Bryant*, 285 Kan. 970, 179 P.3d 1122 (2008), discusses the district court's duty to inquire into potential conflicts of interest. There, at a motions hearing and again at the subsequent sentencing hearing, the district judge investigated Bryant's claims of poor communication with his attorney by asking open-ended questions to learn all of the defendant's concerns. Our Supreme Court noted that the district court fulfilled its investigative obligation by fully hearing Bryant's attorney's responses to Bryant's complaints. 285 Kan. at 991.

Here, the district court's inquiry was adequate, but barely. In light of *Bryant*, it perhaps would have been preferable for the district court to specifically ask Roe to

8

answer Linxwiler's complaints instead of rendering its decision supported only by Roe's interjections. However, the court fulfilled its duty of asking open-ended questions to ascertain the nature of Linxwiler's complaints and heard Roe's responses. Specifically, when Linxwiler accused Roe of only spending approximately 30 minutes discussing the case with him, Roe controverted Linxwiler's assertion by remarking that he had spent much longer than 30 minutes with Linxwiler, although admittedly, he did not specifically say how much time he spent. With respect to Linxwiler's complaint that he had not timely received discovery materials from Roe, Roe responded that he had provided Linxwiler with the materials months prior and would do so again.

Consequently, we conclude the record before us is sufficient to hold that the district court complied with its investigative obligation because Roe's comments during both hearings responded to Linxwiler's complaints. However, even assuming the district court failed to conduct a sufficient inquiry, Linxwiler's complaints about the time he spent with counsel did not justify the appointment of new counsel.

The facts of this case are similar to those in *State v. McGee*, 280 Kan. 890, 126 P.3d 1110 (2006), where the defendant in that case also complained about the lack of time defense counsel had spent with him and that his dissatisfaction with his counsel constituted a conflict of interest necessitating the appointment of new counsel. On appeal, McGee asserted that the district court had failed to conduct a sufficient inquiry. In response, our Supreme Court stated:

> "[T]here is no conflict of interest indicated by the allegations in McGee's pro se motion. McGee's motion indicates that he is dissatisfied with the time and attention he received from his trial counsel. While McGee and his attorney may disagree about the amount of time and attention McGee should receive to adequately prepare McGee's defense, that disagreement does not rise to the level of a conflict of interest." 280 Kan. at 897.

9

Like in *McGee*, Linxwiler alleged to the district court that his trial counsel had spent insufficient time meeting with him and was generally doing a poor job representing him. Under *McGee*, such allegations did not amount to a conflict of interest. Accordingly, we must conclude that the district court did not abuse its discretion when it did not dismiss Linxwiler's trial counsel and appoint a new attorney.

### DID THE DISTRICT COURT COMMIT REVERSIBLE ERROR BY FAILING TO INSTRUCT THE JURY ON AN ACCOMPLICE WITNESS?

Next, Linxwiler argues the district court committed reversible error when it failed to provide the jury with the following accomplice instruction: "An accomplice witness is one who testifies that [he or she] was involved in the commission of the crime with which the defendant is charged. You should consider with caution the testimony of an accomplice." PIK Crim. 4th 51.090. Linxwiler concedes that he failed to object to the omission of this instruction at trial but argues its exclusion constitutes clear error.

The State argues that Linxwiler invited this error and therefore may not challenge the district court's omission of the instruction. Under the invited error doctrine, "a defendant cannot challenge an instruction, even as clearly erroneous . . . , when there has been on-the-record agreement to the wording of the instruction at trial." *State v. Peppers*, 294 Kan. 377, 393, 276 P.3d 148 (2012).

In *Peppers*, the defendant challenged the inclusion of an inappropriate jury instruction. Our Supreme Court denied relief under the invited error doctrine "because the district judge explicitly stated that she would not give the instruction if either side objected. After reviewing the instruction, Peppers' counsel stated that counsel had no objection to the giving of the instruction. This on-the-record agreement to the wording of the instruction was invited error." 294 Kan. at 393.

10

Here, when asked, Linxwiler's trial counsel explicitly stated he did not want the jury provided with an accomplice witness instruction:

> "THE COURT: Okay. I did want to note on the record there is not an instruction for accomplice testimony. Does the defendant desire to have that instruction?
> "[ROE]: No, sir. I believe based on the testimony we do not want that instruction.
> "THE COURT: All right, then. I leave this up to you and I will not give the jury that instruction."

Because there was an on-the-record agreement from Linxwiler's counsel to omit the accomplice witness instruction, we need not analyze further whether this omission was appropriate. Linxwiler invited the error and is thus precluded from challenging it.

### DID THE DISTRICT COURT ERR BY USING LINXWILER'S CRIMINAL HISTORY SCORE IN DETERMINING HIS SENTENCE?

Finally, Linxwiler argues the use of his criminal history to calculate his guidelines sentence was unconstitutional since those past convictions were not proved in this case to a jury. See *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). However, our Supreme Court has rejected this argument on more than one occasion, and we reject it as well. See *State v. Baker*, 297 Kan. 482, 485, 301 P.3d 706 (2013); *State v. Ivory*, 273 Kan. 44, 46-47, 41 P.3d 781 (2002).

Affirmed.